2007 ND 130

In the Matter of the ESTATE OF
Margaret ALLMARAS,
Deceased

Anthony Allmaras, Daniel Allmaras,
David Allmaras, Geri Allmaras, Rus-
sell Allmaras, Shelly Schullum, Timo-
thy Allmaras and Todd Allmaras, Pe-
titioners and Appellants,

v.

Robert E. Manly, Personal Representa-
tive of the Estate of Margaret Allmar-
as, and Linda Allmaras, Respondents
and Appellees.

No. 20060380.

Supreme Court of North Dakota.

Aug. 22, 2007.

David R. Bliss, David R. Bliss, P.C.,
Bismarck, ND, for petitioners and appel-
lants.

Daniel J. Frisk (argued) and Don R.
Grande (appeared), Don R. Grande, P.C.,
Fargo, ND, for respondents and appellees.

VANDE WALLE, Chief Justice.

[¶ 1]   Anthony Allmaras, Daniel Allmar-
as, David Allmaras, Geri Allmaras, Russell
Allmaras, Shelly Schullum, Timothy All-
maras, and Todd Allmaras ("the petition-
ers") appealed from a district court order
denying their petition for allowance of a
claim in Margaret Allmaras's estate.  We

conclude the record contains insufficient evidence about whether the conservator properly deposited the funds at issue into a general guardianship account. In particular, we cannot determine from the record whether the conservator appropriately considered any known estate plan of Margaret Allmaras as required by statute. Therefore, we reverse and remand for further proceedings.

I

[¶ 2] At the time of the events relevant to this dispute, Margaret Allmaras was an elderly woman in her early 80s. Although Margaret Allmaras never had any children, she had twenty-one nieces and nephews who were the children of her three brothers, Jerome Allmaras, Gerard Allmaras, and John Allmaras. Jerome Allmaras had thirteen children. Gerard Allmaras and John Allmaras had eight children between them, and these eight nieces and nephews of Margaret Allmaras are the petitioners in this case.

[¶ 3] On August 7, 2000, Margaret Allmaras executed a general durable power of attorney appointing her brother, Gerard Allmaras, and her sister-in-law, Lorraine Allmaras, as her agents. Lorraine Allmaras was the wife of Margaret's brother John Allmaras. In the appointment document, Margaret Allmaras granted her agents "full power and authority to act on [her] behalf," including the power to "[c]onduct any business with any banking or financial institution with respect to any of [her] accounts." Each agent was granted the power to act independently of the other.

[¶ 4] About a month later, on September 15, 2000, Margaret Allmaras executed a will. In the will, she acknowledged the existence of nonprobate cash accounts and investments. Her will gave "all of my cash accounts, insurance proceeds or investments which are not co-owned or jointly owned, in equal shares to the children of my deceased brother, Jerome Allmaras."

[¶ 5] In the twenty years before her death, Margaret Allmaras accumulated a large number of certificates of deposit ("CDs") at three different banks, Western State Bank in Devils Lake, Security State Bank in New Rockford, and Bremer Bank in Carrington. On December 12, 2000, she consolidated some of these CDs into a large CD account at Bremer Bank in Carrington. The CD was a single-party account worth $83,531.11, payable on death ("P.O.D.") to all twenty-one of Margaret Allmaras's nieces and nephews.

[¶ 6] Margaret Allmaras was admitted to a nursing home in early 2001. About six months later, Lorraine Allmaras began exercising her power of attorney to take funds from Margaret Allmaras's financial accounts, including the CD account at Bremer Bank. Between about June 2001 and June 2002, Lorraine Allmaras wrongfully withdrew the entire $83,531.11 in the Bremer Bank CD account for her own use. In early 2003, Gerard Allmaras, the other attorney-in-fact, discovered this misappropriation and reported it to Robert E. Manly, Margaret Allmaras's attorney. Later that year, in December 2003, a guardianship and conservatorship was established for Margaret Allmaras, and Guardian and Protective Services of Bismarck ("GAPS") was named her guardian and conservator. Lorraine Allmaras was criminally prosecuted for the theft, and in October 2004 she pled guilty and was ordered to pay $105,665.33 in restitution "to the Margaret Allmaras Guardianship/Conservatorship."

[¶ 7] On April 21, 2005, about one week prior to Margaret Allmaras's death, Lorraine Allmaras repaid the stolen funds. GAPS received the restitution and deposited it into Margaret Allmaras's guardianship account. GAPS did not return the money to the form it had been in before

the theft, a CD account with Margaret Allmaras's twenty-one nieces and nephews as P.O.D. beneficiaries. Margaret Allmaras died on April 28, 2005, at the age of 84. Shortly thereafter, her will was admitted to probate, and attorney Robert Manly was appointed as personal representative of the estate.

[¶ 8] The eight petitioners filed a claim against the estate, seeking a share of the $83,531.11 which was stolen by Lorraine Allmaras. The petitioners claimed that the guardian and conservator should have returned the funds to their original form as a CD account with all twenty-one nieces and nephews named as P.O.D. beneficiaries, rather than allowing the funds to pass to only the thirteen nieces and nephews under Margaret Allmaras's will. The personal representative denied the claim.

[¶ 9] The petitioners requested a hearing before the district court on the matter. At the hearing, Robert Manly was the only witness. Manly was Margaret Allmaras's longtime attorney, and he drafted her power of attorney and her will. He testified that Margaret Allmaras was a very intelligent person who was in declining health by the year 2000. He stated that she was mentally competent at the time she executed her power of attorney and her will, but that she didn't have "quite as much fire and spunk." With regard to her estate plan, Manly explained that he only knew about Margaret Allmaras's will and not her other jointly owned accounts. In her will, Margaret Allmaras favored the thirteen children of her brother Jerome Allmaras because "[t]hey were a large family" and "[s]he felt that she should do something for them."

[¶ 10] When he was questioned about the CD accounts, Manly testified that Margaret Allmaras never consulted him about them, but that he knew some joint accounts existed. However, he did not know how much money she had in her nonprobate accounts or exactly whose names were on them. Manly explained that his clients usually discuss nonprobate property with him as part of their estate plan, but that Margaret Allmaras never did. He stated, "I didn't know what she was doing with her joint accounts, she never volunteered, I just felt it wasn't my business to ask." Petitioners' counsel asked Manly whether he ever notified the criminal court or GAPS that the restitution paid by Lorraine Allmaras came from a P.O.D. account. Manly gave the following response:

A. I didn't know, no, when it was paid. Although they knew that, I'm not sure if they would have had knowledge that the money they were getting back was, you know—They were more concerned I think with getting the money back in Margaret's account than worrying about, you know, where it came from. There was other funds that came in that were repaid. There was 110,000, approximately, and there was about 85,000 out of this certificate, so I don't know what they were thinking. They simply put it into Margaret's guardianship account without taking any action on it.

There was no testimony from any representative of GAPS about the manner in which the restitution funds were handled prior to Margaret Allmaras's death.

[¶ 11] After considering the evidence, the district court held that the personal representative properly denied the petitioners' claim to a share in Margaret Allmaras's estate. The district court found that the CD account, along with its P.O.D. provision, was destroyed when Lorraine Allmaras withdrew the money, and that GAPS properly deposited the restitution into an account for the benefit of Margaret Allmaras. The district court stated, "The conservators and guardians, once that

agency became appointed those moneys easily could have been used to care for Margaret and they would have lost—they may have even been used in total for her care had she lived longer. . . ." The district court concluded that because the funds were properly held in the guardianship account, they passed under Margaret Allmaras's will to the thirteen children of her brother Jerome Allmaras.

## II

[¶ 12] The district court has discretionary authority regarding the management of a protected person's estate, and the court's decisions on those matters will only be reversed on appeal for an abuse of discretion. *Guardianship of Thomas,* 2006 ND 219, ¶ 13, 723 N.W.2d 384; *Conservatorship of Stensland,* 526 N.W.2d 485, 486 (N.D.1995). A district court abuses its discretion when it acts in an arbitrary, unreasonable, or unconscionable manner, or when it misinterprets or misapplies the law. *Thomas,* at ¶ 7.

[¶ 13] The interpretation and application of a statute is a question of law which is fully reviewable on appeal. *Estate of Gleeson,* 2002 ND 211, ¶ 7, 655 N.W.2d 69. We interpret uniform laws in a uniform manner, and we may seek guidance from decisions in other states which have interpreted similar provisions in a uniform law. N.D.C.C. § 1–02–13; *see, e.g., Estate of Zimmerman,* 2001 ND 155, ¶ 14, 633 N.W.2d 594.

[¶ 14] Petitioners argue that they should receive a share of the $83,531.11 which Lorraine Allmaras repaid as restitution because they were P.O.D. beneficiaries on the CD account bearing those funds prior to the theft. Essentially, petitioners claim that either the conservator or the supervising court should have returned the restitution money to its pre-theft form. The respondents, Linda Allmaras and Robert Manly, contend that the conservator acted properly when it deposited the restitution into the guardianship account for the benefit and care of Margaret Allmaras, and that petitioners are not entitled to a share of the money under Margaret's will.

[¶ 15] This case involves the intersection of two major statutory schemes, the statutes governing conservatorships and the statutes governing payable-on-death accounts.

[¶ 16] Chapter 30.1–29, N.D.C.C, governs the appointment and operation of conservatorships, which are designed to protect the property of persons under disability. Chapter 30.1–29 is part of our enactment of the Uniform Probate Code. *Conservatorship of Kinney,* 495 N.W.2d 69, 70–71 (N.D.1993).

[¶ 17] A conservator is a fiduciary and therefore owes a high degree of good faith to the ward, the estate of the ward, and other persons interested in the estate. *See* N.D.C.C. § 30.1–29–17; *Stensland,* 526 N.W.2d at 486. In administering the protected person's estate, the conservator has the discretion to exercise a broad range of powers. *See* N.D.C.C. § 30.1–29–24; *Kinney,* 495 N.W.2d at 71. Section 30.1–29–24, which delineates the powers of the conservator, provides in relevant part:

2. A conservator has power, without court authorization or confirmation, to invest and reinvest funds of the estate as would a trustee.

3. A conservator, acting reasonably in efforts to accomplish the purpose for which the conservator was appointed, may act without court authorization or confirmation, to:

a. Collect, hold, and retain assets of the estate including land in another state, until, in the conservator's judgment, disposition of the assets

should be made, and the assets may be retained even though they include an asset in which the conservator is personally interested.

. . . .

e. Invest and reinvest estate assets in accordance with subsection 2.

f. Deposit estate funds in a bank including a bank operated by the conservator.

g. Acquire or dispose of an estate asset including land in another state for cash or on credit, at public or private sale, and to manage, develop, improve, exchange, partition, change the character of, or abandon an estate asset.

*See also Kinney*, 495 N.W.2d at 71 (noting that N.D.C.C. § 30.1–29–08(2)(c) gives the supervising court similarly broad powers over a protected person's estate); *Kopperud v. Reilly*, 453 N.W.2d 598, 600–01 (N.D.1990) (holding probate court has authority to consider action to rescind a conservator's deed after death of the protected person because issues are incidental to court's jurisdiction over decedent's estate). The conservator is to expend or distribute funds "reasonably necessary for the support, education, care, or benefit of the protected person," taking into account various factors including the size of the estate, the probable duration of the conservatorship, and the protected person's accustomed standard of living. N.D.C.C. § 30.1–29–25(1)(b).

[¶ 18] However, although conservators are vested with broad discretionary powers, they cannot invest and distribute assets of the estate without regard for the protected person's estate plan. Section 30.1–29–27 provides:

In investing the estate, and in selecting assets of the estate for distribution under subsections 1 and 2 of section 30.1–29–25, in utilizing powers of revocation or withdrawal available for the support of the protected person, and exercisable by the conservator or the court, the conservator and the court should take into account any known estate plan of the protected person, including the protected person's will, any revocable trust of which the protected person is settlor, and any contract, transfer, or joint ownership arrangement with provisions for payment or transfer of benefits or interests at the protected person's death to another or others which the protected person may have originated. The conservator may examine the will of the protected person.

Thus, a conservator has discretionary authority to manage the protected person's property and finances, subject to the conservator's fiduciary responsibilities and taking into account any known estate plan of the protected person. *See Kinney*, 495 N.W.2d at 71–72. The language of § 30.1–29–27 specifically includes P.O.D. accounts which were originated by the protected person as part of an estate plan.

[¶ 19] Chapter 30.1–31, N.D.C.C., governs nonprobate transfers on death, including P.O.D. accounts. *See Estate of Leier*, 524 N.W.2d 106, 107–109 (N.D.1994) (discussing generally our statutory provisions governing nonprobate transfers at death). The statutes dealing with P.O.D. accounts contain some fairly straightforward principles which are applicable in this case. Under N.D.C.C. § 30.1–31–08(3), "[a] beneficiary in an account having a P.O.D. designation has no right to sums on deposit during the lifetime of any party." *See also* N.D.C.C. § 30.1–31–02(6) (defining "party" as a person who has a present right to payment from the account other than as a beneficiary or agent). The P.O.D. account funds belong to any surviving beneficiaries only upon death of the sole party or the last survivor of two or

more parties. N.D.C.C. § 30.1–31–09(2)(b); *see also Leier*, 524 N.W.2d at 110. "Rights at death under section 30.1–31–09 are determined by the terms of the account at the death of a party." N.D.C.C. § 30.1–31–10(1).

[¶ 20] *In Estate of Lahren*, 268 Mont. 284, 886 P.2d 412, 414 (1994) (citations omitted), the Montana Supreme Court explained the effect of these uniform act provisions in the context of a certificate of deposit account with P.O.D. beneficiaries:

A P.O.D. designation provides that the beneficiary receives an interest in the CD *only at the death of the depositor.* The P.O.D. certificate of deposit is akin to an insurance policy—the proceeds cannot be claimed by the beneficiary until death. At any time before the depositor's death, the depositor can change the beneficiary or withdraw the account and use the funds. However, the P.O.D. beneficiary has no such right.

Therefore, a P.O.D. beneficiary has no present interest in the account, no right to prevent the depositor from removing the account funds and effectively destroying the beneficiary designation, and no right to preclude the depositor from changing or removing the beneficiaries on the account.

[¶ 21] Petitioners argue that under N.D.C.C. § 30.1–31–12, the conservator may withdraw funds from a nonprobate account with a P.O.D. designation only if there is a necessity for the funds and the other assets of the estate are insufficient. Section 30.1–31–12(1) provides:

If other assets of the estate are insufficient, a transfer resulting from a right of survivorship or P.O.D. designation under sections 30.1–31–02 through 30.1–31–20 is not effective against the estate of a deceased party to the extent needed to pay claims against the estate and statutory allowances to the surviving spouse and children.

*In Estate of Leier*, 524 N.W.2d 106, 109 (N.D.1994), we explained the purpose and effect of this statutory provision:

Relief from the nontestamentary transfers authorized by NDCC Chapter 30.1–31 is enabled by NDCC 30.1–31–12, if the assets of the estate are insufficient to pay the claims against the estate and the statutory allowances for the surviving spouse and children. According to the Editorial Board Comment, that section gives a remedy to creditors, the surviving spouse, and minor children to assure them that effective nonprobate transfers at death cannot reduce their essential protections if those transfers would have been testamentary.

Section 30.1–31–12, by its plain language, does not require a conservator to exhaust all other assets of a protected person's estate before withdrawing the funds from a nonprobate financial account with P.O.D. beneficiaries. Petitioners' argument regarding the operation of this statute is without merit.

[¶ 22] Applying these principles to the case at hand, the petitioners, as P.O.D. beneficiaries, had no present interest in Margaret Allmaras's CD account when it was still intact prior to the theft. Margaret Allmaras could have withdrawn the funds at any time or removed the petitioners as beneficiaries, and the petitioners would have had no cause for complaint. However, this case is complicated by Lorraine Allmaras's theft of the CD account funds, which destroyed the P.O.D. designation on the account without any action on the part of Margaret Allmaras. When Lorraine Allmaras repaid the money as restitution, it was paid to the Margaret Allmaras Guardianship/Conservatorship.

[¶ 23] At this point, the actions of GAPS, Margaret Allmaras's guardian and conservator, become relevant. Under the

provisions of N.D.C.C. ch. 30.1–29, the conservator had broad discretionary powers to administer Margaret Allmaras's estate, including the power to invest or deposit the restitution funds. However, the conservator did not have completely unfettered discretion to act on her behalf. Section 30.1–29–27 provides that the conservator should take into account any known estate plan of the protected person when investing and distributing estate assets.

[¶ 24] The issue in this case is whether the conservator appropriately considered any known estate plan of Margaret Allmaras. If Margaret Allmaras needed the restitution funds in order to provide for her care and support, the conservator likely acted in a proper manner when it simply deposited the funds into a general account. However, the record contains little evidence about the actions or the rationale of the conservator. Robert Manly testified that he did not know what the conservator was thinking when it deposited the restitution funds. Neither the petitioners nor the respondents called a representative of GAPS to testify about the manner in which the restitution was handled. The district court speculated that the conservator needed the money to care for Margaret Allmaras, but the record does not reveal whether the funds were actually needed for Margaret Allmaras's care and support, whether other readily accessible funds were available, and, significantly, whether the conservator took her estate plan into account as required by statute.

[¶ 25] Although the conservator clearly had broad discretion to act on behalf of Margaret Allmaras, we cannot determine from the record the manner in which the conservator exercised its discretion in this case. We do not know whether the conservator was aware that the twenty-one nieces and nephews had been beneficiaries on a P.O.D. account and ever considered returning the assets to that form, or even whether the conservator knew it had the power to do so. Therefore, we reverse the district court's order and remand for an evidentiary hearing to determine whether Margaret Allmaras's conservator properly exercised its powers under N.D.C.C. ch. 30.1–29.

[¶ 26] DALE V. SANDSTROM, and MARY MUEHLEN MARING, JJ., concur.

KAPSNER, Justice, dissenting.

[¶ 27] I respectfully dissent.

[¶ 28] The petitioners appealed from a district court order denying their claim in Margaret Allmaras's estate. I would conclude the petitioners failed to meet their burden of proof and to take the appropriate procedural steps to pursue their claim. I find no North Dakota law permitting the personal representative or district court to recreate nonprobate property when such a recreation would be contrary to an express provision in Margaret Allmaras's valid will. Therefore, I would affirm the decision of the district court.

I.

[¶ 29] A district court has discretionary authority with regard to the management of a protected person's estate; the decision of the district court will be reversed only if there has been an abuse of discretion. *See Guardianship of Thomas*, 2006 ND 219, ¶ 7, 723 N.W.2d 384 (applying the abuse of discretion standard and explaining the non-applicability of the clearly erroneous standard provided under N.D.R.Civ.P. 52(a)); *Conservatorship of Kinney*, 495 N.W.2d 69, 71 (N.D.1993). An abuse of discretion occurs when the district court acts in an arbitrary, unreasonable, or unconscionable manner. *Kinney*, at 71.

[¶ 30] The interpretation or application of a statute is a question of law and is fully reviewable on appeal. *Estate of Gleeson,* 2002 ND 211, ¶ 7, 655 N.W.2d 69. When interpreting uniform laws in a uniform manner, we may consider decisions from other states that have interpreted similar provisions of uniform law. *Id.* (quoting *Estate of Zimmerman,* 2001 ND 155, ¶ 14, 633 N.W.2d 594). When interpreting and applying provisions in the Uniform Probate Code ("Code"), we may look to the Code's Editorial Board Comments. *Gleeson,* 2002 ND 211, at ¶ 7, 655 N.W.2d 69 (citing *Zimmerman,* at ¶ 14).

[¶ 31] The petitioners argue they should receive a share of the $83,531.11, which was once in the form of a CD account in which the petitioners were all P.O.D. beneficiaries. But for the theft committed by Lorraine Allmaras, the petitioners claim they would have received shares of the CD account funds, rather than the funds passing to only thirteen of the twenty-one original P.O.D. beneficiaries under the residuary clause in Margaret Allmaras's will. In essence, the petitioners argue the supervising court or, perhaps the conservator, who is not a named party in this case, should have converted the restitution money back into CD accounts, bearing the names of all twenty-one original P.O.D. beneficiaries. The respondents, Linda Allmaras and Robert Manly, contend the conservator properly deposited the restitution money for the benefit and care of Margaret Allmaras. The respondents further argue the restitution money passed properly under the residuary clause in Margaret Allmaras's will to only thirteen, rather than twenty-one, of her nieces and nephews because the CD account naming all twenty-one nieces and nephews no longer existed at the time of Margaret Allmaras's death.

[¶ 32] This case presents two major issues: (1) whether the petitioners met their burden of proof and took the necessary procedural steps to obtain relief from the district court; and (2) whether North Dakota law permits an estate's personal representative or court to recreate non-probate property on behalf of a deceased person and to distribute that property contrary to an express provision in the testator's will.

## A. Failure of Proof

[¶ 33] The petitioners allege GAPS's failure to restore the restitution funds to their pre-theft CD account form, naming all twenty-one nieces and nephews as P.O.D. beneficiaries, thwarts Margaret Allmaras's true donative intent. Section 30.1–29–27, N.D.C.C., speaks, in part, to the petitioners' claim:

> [I]n selecting assets of the estate for distribution . . . the conservator and the court *should* take into account *any known estate plan* of the protected person, *including the protected person's will,* . . . and any contract, transfer, or joint ownership arrangement with provisions for payment or transfer of benefits or interests at the protected person's death to another or others which the protected person may have originated. The conservator may examine the will of the protected person.

N.D.C.C. § 30.1–29–27 (emphasis added).

[¶ 34] Assuming N.D.C.C. § 30.1–29–27 carries with it a *requirement,* and not a discretionary power, that a conservator consider any known estate plan of a protected person, the petitioners have the burden to prove that GAPS knew of the CD account and its beneficiaries. *Contra* N.D.C.C. § 30.1–29–27 & cmt. (citing *Conservatorship of Kinney,* 495 N.W.2d 69, 72 (N.D.1993) (explaining a court's or conservator's consideration of the known estate plan of the protected person is "permissi-

ble," rather than mandatory, under N.D.C.C. § 30.1–29–27)). The petitioners have the burden of proving GAPS, in its broad discretion to act for the benefit of Margaret Allmaras, violated its fiduciary duties when it failed to recreate the CD account. Finally, the petitioners also have the burden to prove the CD account was indeed part of the estate plan at the time the conservator received the funds.

[¶ 35] Section 30.1–29–17, N.D.C.C., provides that a conservator's exercise of power and its fiduciary relationship shall be governed by the same standard of care as a trustee. N.D.C.C. § 30.1–29–17. A trustee, and therefore a conservator, is held to a prudent person standard. N.D.C.C. § 30.1–34–02 & cmt. (citing *Estate of Cook*, 20 Del.Ch. 123, 171 A. 730, 731 (1934)). The prudent conservator is one who exercises care in a manner consistent with that of the ordinarily prudent person who feels "morally bound" to act for the benefit of the protected person and the estate's beneficiaries. *E.g., Cook*, 171 A. at 731. A conservator acts under a duty to exercise the same level of skill and care as a person of ordinary prudence who deals with his or her own property. *Id.* A conservator also has a duty to act in good faith. *E.g.*, N.D.C.C. § 30.1–29–17; *Matter of Adams Trust*, 1997 ND 19, ¶ 11, 559 N.W.2d 221. A conservator meets his fiduciary duties when he acts in good faith and with prudent care, caution, and diligence in light of the contemporaneous circumstances, and not in light of subsequent events. *E.g., Cook*, 171 A. at 730–31.

[¶ 36] Reviewing the evidence submitted by the petitioners at the hearing under the above standards, it is clear the petitioners failed to establish a violation of those standards and the district court properly denied the claim. The petitioners' sole witness was Robert Manly, Margaret Allmaras's attorney and the personal representative of her estate. Manly testified to Margaret Allmaras's capacity in creating her will and power of attorney, her preferences regarding heirs and prospective beneficiaries, and, to a far more limited extent, the creation and existence of other nonprobate accounts.

[¶ 37] Manly testified Margaret Allmaras was mentally competent at the time she executed both her will and the general durable powers of attorney for Gerard and Lorraine Allmaras. Manly testified he knew Margaret Allmaras had nonprobate accounts, but she never volunteered to divulge any details of those accounts and he never pursued the topic. Manly explained that while he did not have knowledge of particular details regarding the nonprobate accounts at the time Margaret Allmaras drafted her will, she did acknowledge the existence of nonprobate accounts and directed that her will give "all of my cash accounts, insurance proceeds or investments which are not co-owned or jointly owned, in equal shares to the children of my deceased brother, Jerome Allmaras." Manly explained Margaret Allmaras tended to favor the thirteen children of her brother Jerome Allmaras in her bequests and, at least in her will, did not attempt to equalize the amount of inheritance between all twenty-one nieces and nephews.

[¶ 38] Manly could not testify as to the knowledge, if any, GAPS had regarding the nature or origin of the restitution money it received. When petitioners' counsel specifically asked Manly whether he had ever notified GAPS that the restitution money had once been held in the form of a CD account, Manly responded

A. I don't know, no, when it was paid. Although they knew that, I'm not sure if they would have had knowledge that the money they were getting back was, you know—They were more concerned I think with getting the money back in

Margaret's account than worrying about, you know, where it came from. There was other funds that came in that were repaid. There was [$]110,000, approximately, and there was about [$]85,000 out of this certificate, so I don't know what they were thinking. They simply put it into Margaret's guardianship account without taking any action on it.

[¶ 39] Robert Manly's testimony does not demonstrate GAPS had any knowledge that the restitution money was once in the form of a CD account, nor does his testimony shed light on GAPS's knowledge, or lack thereof, as to the original twenty-one P.O.D. beneficiaries on that account.

[¶ 40] Petitioners did not call a witness representing GAPS to testify regarding whether GAPS had any knowledge of the named beneficiaries on the P.O.D. account from which the funds had been stolen. Petitioners were not able to establish whether GAPS ever spoke with or made attempts to speak with Margaret Allmaras about her wishes regarding the recovered funds. In relying only on the testimony of Robert Manly, the petitioners did not show GAPS failed to consider "any known estate plan" of Margaret Allmaras under N.D.C.C. § 30.1–29–27, because they did not put forth any evidence that GAPS had any knowledge of the CD account or its intended P.O.D. beneficiaries.

[¶ 41] To determine whether a conservator has met his fiduciary duties, his actions are considered in light of the contemporaneous circumstances, and not in light of subsequent events. *Cook*, 171 A. at 731. A conservator also has broad discretion with regard to the management of estate assets in his capacity as a fiduciary. *See* N.D.C.C. § 30.1–29–24 (providing that a conservator has numerous powers with regard to the maintenance, collection, acquisition, disposal, and distribution of a protected person's estate funds); N.D.C.C. § 30.1–29–25 (providing, among other powers, the authority to expend and distribute for the support and needs of the protected parties, so long as the conservator gives "due regard" to certain balancing factors). Section 30.1–29–25, N.D.C.C, allows a conservator to consider items such as a protected person's medical needs, support, and standard of living when the conservator expends, or chooses not to expend, estate assets. *See Kinney*, 495 N.W.2d at 71–72 (applying N.D.C.C. § 30.1–29–25 and upholding a district court's decision to sell real property for the support and needs of the protected person, despite the fact that the sale would preclude the protected person's son from purchasing or inheriting the property).

[¶ 42] There was no evidence presented by petitioners at the hearing to show GAPS acted in an unreasonable or impermissible manner when it did not recreate the CD account. Again, the testimony of Robert Manly did not provide any facts regarding what GAPS considered when it made its decision how to deposit the money for the benefit of Margaret Allmaras. Manly testified, "I don't know what they were thinking," when asked about GAPS's actions on the restitution funds. GAPS was never called as a witness and therefore could not testify to its decision-making process, such as balancing the needs for support of Margaret Allmaras against the size of the estate. For these reasons, the petitioners failed to prove that GAPS violated any duties it may have owed to them as once-prospective beneficiaries because they proffered no evidence of the reasoning underlying GAPS's placement of the restitution funds. The failure to procure and question GAPS at the hearing led to a complete failure of proof with respect to the allegation that GAPS acted improperly as a fiduciary to Margaret Allmaras.

[¶ 43] Finally, because of the requirement that the conservator's actions are not judged in hindsight, it is worth noting that GAPS would have had a period of only one week to recreate the CD account, if it had knowledge of the CD account and the P.O.D. beneficiaries. The restitution funds were paid to GAPS on April 21, 2005, and Margaret Allmaras died on April 28, 2005. The CD account had been non-existent for a period of almost three years when GAPS received the restitution funds.

[¶ 44] The CD account funds had been exhausted since June 2002. GAPS was not appointed as a conservator and guardian until 2003. Petitioners did not present any evidence that Margaret Allmaras attempted to recreate the funds or to amend her will between the time the funds were stolen and the appointment of GAPS. No evidence presented demonstrates it was Margaret Allmaras's continued donative intent to allot the CD account funds to the petitioners in direct contradiction with her valid will during this period of competency. Nor was evidence presented demonstrating GAPS had knowledge of such a continued donative intent during the seven-day period between the receipt of the cash funds and Margaret Allmaras's death.

[¶ 45] The short period between receipt of the restitution and Margaret Allmaras's death would have given GAPS very little time to establish the original form of the funds, the P.O.D. beneficiaries, and to weigh and balance the needs of Margaret Allmaras against other factors. Because the petitioners did not provide evidence of other contemporaneous circumstances that would have allowed GAPS to recreate the funds, they fail in their burden of proof here as well. Therefore, when the district court denied the petitioners' claim to shares in the restitution money, it did not abuse its discretion.

## B. Failure in Procedure

[¶ 46] In addition to the petitioners' failure to prove, there is a procedural issue that plagues the petitioners' claim; the petitioners allege the conservator improperly failed to convert the restitution funds to their pre-theft CD account form, but the petitioners did not join the conservator, GAPS, in their claim. Instead, the petitioners named only Robert Manly and Linda Allmaras, although they complain of the action or inaction on the part of GAPS.

[¶ 47] Chapter 30.1–18, N.D.C.C., governs the duties and powers of personal representatives. Section 30.1–18–03(1), N.D.C.C, discusses the general duties governing personal representatives. The relevant portion of this statute reads:

A personal representative is under a duty to settle and distribute the estate of the decedent *in accordance with the terms of any probated and effective will* and this title, and as expeditiously and efficiently as is consistent with the best interests of the estate.

N.D.C.C. § 30.1–18–03(1) (emphasis added). Section 30.1–18–15, N.D.C.C., which outlines specific transactions a personal representative may engage in, does not allow a personal representative to convert probate property into nonprobate property for the purposes of changing the distribution of the residuary estate. Rather, the personal representative is required to collect, inventory, settle, and distribute the property in accordance with the decedent's will, unless a statute provides an exception.

[¶ 48] Robert Manly was the wrong party to sue under petitioners' theory of their cause of action. He received probate property, in the form of a cash account, from GAPS. He had an effective will from Margaret Allmaras, which unambiguously gave "all of [her] cash accounts, insurance proceeds or investments which are not co-owned or jointly owned, in equal shares to

the children of [her] deceased brother, Jerome Allmaras." Manly had no statutory authority to convert the funds when such an act would have been in direct contradiction to Margaret Allmaras's will.

[¶ 49] Under petitioners' alleged claim, the conservator, GAPS, is the party against whom suit should have been brought. In *Conservatorship of Kinney,* James Kinney, the son of protected person Almira Kinney, appealed a county court order permitting the protected person's conservator to sell her automobile, homestead, and other personal property. 495 N.W.2d at 69. This Court noted that the conservator, First National Bank, had the power to sell Almira Kinney's real property without court approval, but First National Bank sought the court order under N.D.C.C. § 30.1–29–16(2), requesting instructions regarding its fiduciary responsibilities. *Id.* at 71. After the county court allowed the sale, James Kinney appealed, arguing the county court erred in granting First National Bank's request. *Id.* at 69–70. This Court upheld the decision of the county court. *Id.* at 69, 72. Similarly, in *Conservatorship of Stensland,* the personal representatives of an estate sued a conservator, alleging the conservator violated her affirmative statutory fiduciary duty to account. 526 N.W.2d 485, 486–87 (N.D. 1995).

[¶ 50] In *Kinney,* the petitioner relied upon the same "any known estate" language under N.D.C.C. § 30.1–29–27 as the petitioners urge in this case. *Kinney,* 495 N.W.2d at 72. The statute expressly explains that the "conservator and the court" are the parties who may consider all components of an estate plan, including P.O.D. accounts, before expending estate assets; the statute does not apply to personal representatives. N.D.C.C. § 30.1–29–27. In *Stensland,* the plaintiffs sued the conservator because the conservator failed to comply with the affirmative statutory duty to account. *Stensland,* 526 N.W.2d at 486–87.

[¶ 51] In *Kopperud v. Reilly,* an estate's personal representative sued the decedent's conservator, alleging breach of fiduciary duty and requesting rescission of a contract for deed, after the conservator sold a portion of the estate to her son well below fair market value. 453 N.W.2d 598, 599 (N.D.1990). The conservator was properly sued in this case because it was the conservator who sold land in a transaction where she had a conflict of interest and where the land was assigned intended beneficiaries under a protected person's will. *Id.* at 600 & n. 3. The *Kopperud* holding provides that a personal representative has the statutory power to sue to *recover* land that had been wrongfully removed from a probatable estate and that a court may affirm such an action. *Id.* at 600–01. *Kopperud* does not, however, stand for the proposition that it is within a personal representative's statutory powers to convert probate property into nonprobate property in direct contraction to a decedent's valid will, nor does the case give a court such powers. *Id. Kopperud* does not present the issues of agency discussed below. In *Kopperud,* there was also an express statutory provision allowing the court to void any sale, encumbrance, or transaction involving the conservator who engages in the transaction when he has a conflict of interest. *Id.* at 600 n. 3 (citing N.D.C.C. § 30.1–29–22). Finally, *Kopperud* is distinguishable from the instant case because the personal representative plaintiff, unlike the petitioners, was suing the conservator to enforce the provisions of a valid will, rather than to defeat them. *Id.* at 602.

[¶ 52] Unlike the petitioners in *Stensland,* the petitioners in the present case do not point to an affirmative statutory duty

breached by the personal representative, the party against whom the suit is brought. The petitioners allege the conservator erred when it did not recreate the CD accounts, but they did not join the conservator in the suit, unlike the petitioners in *Kinney*. Finally, the petitioners are suing in an attempt to circumvent an express provision in Margaret Allmaras's valid will, rather than to enforce a will, unlike the plaintiff in *Kopperud*. Therefore, in addition to the failure of proof regarding the conservator's conduct, the petitioners failed to name the conservator, the party against whom the claim could have been enforced, if they had proven their case. For these reasons, the district court did not abuse its discretion when it denied the petitioners' claim.

## II.

[¶ 53] The next issue is whether the restitution money GAPS received could be considered part of Margaret Allmaras's larger "estate plan" under N.D.C.C. § 30.1–29–27. While the statute does recognize P.O.D. accounts as possible components of an estate plan, the circumstances in this case, combined with the rules on P.O.D. accounts and powers of attorney, lead to the conclusion that Lorraine Allmaras's theft completely destroyed the CD account and any potential right to the P.O.D. beneficiaries' shares. Lorraine Allmaras had depleted the balance of the CD account by June 2002. GAPS was appointed as Margaret Allmaras's guardian and conservator in 2003. There is no evidence Margaret Allmaras made any attempt to alter her valid will created September 15, 2000, at any point after the theft and before the guardian was appointed. As a result, the restitution money was properly repaid in cash form into the guardianship of Margaret Allmaras and those funds passed properly under her will. There is no statutory provision allowing a court or

personal representative to pass portions of a decedent's estate in plain contradiction to an express provision of the decedent's will.

[¶ 54] A general durable power of attorney is a written legal instrument, which creates an agency relationship in which the agent has the authority to do anything the principal could do, unless the principal specifically limits the acts of the agent or attorney-in-fact. N.D.C.C. ch. 30.1–30; *Estate of Littlejohn*, 2005 ND 113, ¶¶ 7–9, 698 N.W.2d 923 (finding that even where a general durable power of attorney did not specifically or expressly provide the authority to convey land, the attorney-in-fact did have the authority to make such a conveyance because the wording of the power of attorney was broad and without limitation). Attorneys-in-fact owe their principals fiduciary duties such as loyalty, confidentiality, and good faith. *E.g., Allard v. Johnson*, 2006 ND 243, ¶ 6, 724 N.W.2d 331.

[¶ 55] There is also a distinction between the *validity* of an agent's act (i.e., whether the agent had the power to do the act) and the *propriety* of the agent's act (i.e., whether the agent acted in good faith or in accordance with fiduciary duties). *See, e.g., Wabner v. Black*, 7 S.W.3d 379, 381 (Ky.1999) (explaining there was no question whether the defendant had the "full power" to redesignate the ownership of her uncle's accounts, even to herself, through a general durable power of attorney; rather, the question was whether the redesignation was "attended by the utmost good faith" and propriety). Thus, an act could be completely valid and binding upon third parties, but the act could, at the same time, be wrongful, and the attorney-in-fact would be liable to the principal for any damages caused. *E.g., Gay & Taylor, Inc. v. Am. Cas. Co.*, 53 Tenn.App. 120, 381 S.W.2d 304, 305–06 (1963) (citations omit-

ted) ("It is universally recognized that an agent stands in a fiduciary relationship to his principal ... and [ ] for a failure [ ] to act [in accordance with fiduciary duties] he subjects himself to liability to his principal").

[¶ 56] Margaret Allmaras gave Lorraine Allmaras a general durable power of attorney. The power of attorney did not have limiting language. The power of attorney gave Lorraine Allmaras the authority to do any act that Margaret Allmaras could have done herself—including the withdrawal of money from the CD account. While Lorraine Allmaras certainly acted wrongfully, even criminally, when she withdrew funds from the CD accounts, her acts were valid because she held a general durable power of attorney for Margaret Allmaras.

[¶ 57] In addition to the general agency principle allowing agents to act on behalf of and bind their principals, section 30.1-31-17, N.D.C.C., explicitly provides the rule for agents and P.O.D. account withdrawals:

> A financial institution, on request of an agent under an agency designation for an account, may pay to the agent sums on deposit in the account, whether or not a party is disabled, incapacitated, or deceased when the request is made or received, and whether or not the authority of the agent terminates on the disability or incapacity of a party.

Lorraine Allmaras was an "agent" under N.D.C.C. 30.1-31-02 because she was a "person authorized to make account transactions for a party" under the general durable power of attorney she was given by Margaret Allmaras, which authorized her to "[c]onduct any business with any banking or financial institution with respect to any of [Margaret Allmaras's] accounts, including but not limited to, making deposits and withdrawals...."

[¶ 58] Therefore, Lorraine Allmaras validly, but wrongfully, withdrew funds from the CD account at issue between June 2001 and June 2002, completely exhausting the balance in the CD account. Lorraine Allmaras's actions bound the third-party potential beneficiaries, and she was liable as an agent to Margaret Allmaras. Lorraine Allmaras's liability to Margaret Allmaras was satisfied when she paid the restitution.

[¶ 59] Chapter 30.1-31, N.D.C.C., controls nonprobate transfers on death, including P.O.D. accounts. *See Estate of Leier*, 524 N.W.2d 106, 107–09 (N.D.1994) (providing a general discussion of the Uniform Probate Code's treatment of nonprobate assets as adopted in North Dakota). A P.O.D. account beneficiary has no interest in or right to the funds in the account until the death of the depositor. *See* N.D.C.C. §§ 30.1-31-08(3) ("A beneficiary in an account having a P.O.D. designation has no right to sums on deposit during the lifetime of any party."); 30.1-31-02(6) (defining a "party" as a person who has the right to the account funds upon request, but who is not a beneficiary or agent). The depositor may, at any time before his death, change the beneficiary or withdraw the funds from the account. *Estate of Lahren*, 268 Mont. 284, 886 P.2d 412, 414 (1994) (explaining the Uniform Probate Code provisions on P.O.D. accounts).

[¶ 60] Since a P.O.D. beneficiary has no present interest in the account, the depositor could name new beneficiaries or withdraw all account funds, which effectively destroys the original beneficiary designation and the once-existing beneficiary has no recourse or power to stop the depositor. Under the rules of agency, the depositor's authorized agent, including her attorney-in-fact, could withdraw all funds from the P.O.D. account, effectively destroying the P.O.D. designation. In this instance, the

attorney-in-fact would be liable to the principal for any loss incurred, but because the beneficiaries had no present interest, they are without recourse against Margaret Allmaras or her estate.

[¶ 61] Because Lorraine Allmaras was Margaret Allmaras's attorney-in-fact, when she exhausted the account funds between June 2001 and June 2002, she, like a depositor, destroyed the P.O.D. beneficiaries. After the CD account was depleted, Margaret Allmaras's conservatorship received the restitution money and Margaret died, these cash funds could only pass under the terms of her will, which spoke specifically to various types of cash accounts.

[¶ 62] Petitioners claim that passing the funds at issue under the residuary clause in Margaret Allmaras's will violates N.D.C.C. §§ 30.1–31–09(2) and 30.1–31–10(2). Based on the above rules regarding P.O.D. accounts and agency, it is clear petitioners' reliance on N.D.C.C. §§ 30.1–31–09(2) and 30.1–31–10(2) is misplaced; for these statutes to be applicable, there must be an *existing* P.O.D. account at the time of the depositor's death. *See, e.g., Estate of Peterson,* 1997 ND 48, ¶ 11, 561 N.W.2d 618 (distributing existing P.O.D. accounts in accordance with the beneficiaries named on the accounts, rather than distributing the P.O.D. accounts in accordance with a decedent's will, which provided a different distribution scheme). Section 30.1–31–09(2), N.D.C.C., requires payment of sums on deposit to surviving P.O.D. beneficiaries on the death of the depositor. Section 30.1–31–10(2), N.D.C.C., provides that a will may not alter a P.O.D. designation on an account existing at the time of the depositor's death. Because the CD account ceased to exist in June 2002 and Margaret Allmaras did not die until April 2005, N.D.C.C.

§§ 30.1–31–09(2) and 30.1–31–10(2) are not applicable to facts in this case.

[¶ 63] "[U]nder the [Uniform Probate Code's] statutory scheme, a court and a conservator are not empowered to effectively defeat a protected person's estate plan and intentions set forth in a valid will...." *Conservatorship of Sickles,* 518 N.W.2d 673, 679 (N.D.1994) (discussing the prohibition against conservator or court created revocable trusts that would alter the way property passes under valid will); *see also* N.D.C.C. § 30.1–29–08(2) (giving numerous powers and great discretion to a court managing a protected person's estate, but expressly stating courts may not make a protected person's will). If the court had recreated the P.O.D. funds at the behest of the petitioners, it would have defeated the residuary clause in Margaret Allmaras's will.

[¶ 64] At the time the petition was filed, Margaret Allmaras had died and the P.O.D. accounts had been nonexistent for almost three years. The petitioners presented no evidence that Margaret Allmaras was incompetent and could not have recreated the CD accounts between June 2002, the time at which the CD account was completely exhausted, and 2003, when GAPS was appointed as guardian and conservator, if she had so desired. During the intervening period between the theft of the funds and the appointment of GAPS, Margaret Allmaras did not change her will to accommodate all twenty-one original P.O.D. beneficiaries. There was no evidence presented to suggest that Margaret Allmaras was incompetent when she drafted and executed her will in September 2000, which spoke to the distribution of her residuary estate. Therefore, the will establishes her donative intent and was the controlling instrument for the distribution of her estate. *See Estate of Thomas,* 290 N.W.2d 223, 224–26 (N.D.1980) (affirming

a district court order to probate a will and codicil even though the testatrix executed the will at a time when some of the property in the will was no longer part of the estate; the decedent's attorney testified that at the time the will was executed the testatrix was competent and "knew what the value of her property was, where her property was, and where she wanted it to go"); *Boone v. Nelson,* 264 N.W.2d 881, 888 (N.D.1978) (affirming a summary judgment dismissal of plaintiffs' will contest and explaining that a will is valid and controlling when, at the time the document was executed, the testatrix knew the nature of her act, the nature and situation of her property, and her relation to parties that may have claims on her estate).

[¶ 65]   There is no provision under title 30.1, N.D.C.C., that permits a court or personal representative to recreate P.O.D. accounts after the death of a protected person, when doing so would result in a distribution of an estate that is contrary to that person's valid will.

[¶ 66]   Therefore, I would affirm the order of the district court.

[¶ 67]   CAROL RONNING KAPSNER, J.

CROTHERS, Justice, dissenting.

[¶ 68]   I respectfully dissent for the reason stated in Part I A of Justice Kapsner's dissent.

[¶ 69]   DANIEL J. CROTHERS, J.